IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELA S. BENNETT, | CASE NO. 3:25-cv-2424 |
| Plaintiff, | DISTRICT JUDGE |
| | JEFFREY J. HELMICK |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Angela Bennett filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2023, Bennett filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of October

4, 2022.[1] Tr. 255, 266. In her applications, Bennett claimed that she was disabled due to concussion and whiplash from a June 2023 car accident, depression, anxiety, Hashimoto's fibromyalgia, migraines, irritable bowel syndrome, thyroid disease, autoimmune disease, lumbar radiculopathy, carpal tunnel, and a left knee that needed to be replaced. Tr. 306. The Social Security Administration denied Bennett's applications and her motion for reconsideration. Tr. 117, 141–42, 157. Bennett then requested a hearing before an Administrative Law Judge (ALJ). Tr. 193.

In November 2024, an ALJ held a hearing, during which Bennett and a vocational expert testified. Tr. 42–75. The next month, the ALJ issued a written decision finding that Bennett was not disabled. Tr. 17–35. The ALJ's decision became final on September 3, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Bennett filed this action on November 7, 2025. Doc. 1. She asserts the following assignment of error:

> The ALJ opinion errs by failing to consider and take into account the medical evidence that came into the record after the agency opinions.

Doc. 10, at 4.[2]

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2] In this report and recommendation, all of the citations to the parties' briefs refer to the ECF document and page number shown at the top of the page.

**Evidence**

*Personal and vocational evidence*

Bennett was 35 years old on her alleged disability onset date. Tr. 33. She completed the twelfth grade and used to work as a general laborer at a manufacturing facility and an assistant supervisor at a shipping business, loading trucks. Tr. 48, 50–51, 307.

*Relevant medical evidence*

Bennett's alleged disability onset date is October 2022, but she only argues that the ALJ erred with respect to evidence that was added to her case file after the state agency reviewers evaluated her claim. Doc. 10, at 4. Bennett says that this evidence includes treatment notes starting in January 2024, *id.* at 9, so I only discuss this evidence.[3]

---

[3]  Bennett doesn't summarize the medical evidence which she relies on in the *Facts* section of her brief, in violation of this Court's Initial Order. Doc. 6, at 3–4 ("Any facts recited in support of the *Argument* or *Analysis* section of a brief must also be set forth in the *Facts* section of the brief. The Court will not consider facts referenced in a party's argument unless those facts have been set out in the *Facts* section of the party's brief."). Bennett also fails to comply with the citing requirements because she cites the PageID# rather than the transcript pages. *See id.* at 3 ("Citations to the transcript must refer to the page number indicated on the lower right-hand corner of the document, and NOT to the PageID # at the top of the document."). The Commissioner pointed out Bennett's citation mistake in his brief, Doc. 11, at 1, but Bennett did not seek to correct her error. I have therefore summarized the facts in this section primarily the way that the Commissioner presented them in his brief. Bennett's attorney is warned to carefully review the Court's initial order requirements.

3

In February 2024, Bennett had a follow-up appointment with Certified Nurse Practitioner Vivian Appiarius, in the neurology department, for migraines, tension-type headaches, and a sleep disorder. Tr. 1652. Bennett's last visit was in November 2023. Tr. 1656. A treatment note details Bennett's migraine history, including that Bennett reported having had migraines since she was 18 and that her migraines had gotten worse "in the past few years." Tr. 1656. Her migraines were located predominantly on her right temple but could occur on her left side. Tr. 1656. Bennett described the pain as "pounding" and associated with phonophobia, photophobia, osmophobia, nausea, and vomiting. Tr. 1656. She rated her pain an 8 to 9 out of 10 and said that her migraines occurred several times to twice a week, for 15 to 20 days a month. Tr. 1656. Without medication, they could last for 8 to 12 hours. Tr. 1656. Bennett also experienced "mild pain" one to two days per week, which did not turn into migraines. Tr. 1656. There were no migraine patterns or triggers. Tr. 1656. The day of her visit, Bennett said that her preventive medication didn't help and caused more headaches as a side effect, and that her abortive medication helped her pain, though it didn't eradicate it. Tr. 1656–57. Bennett also reported having experienced nightmares "for a long time." Tr. 1656. Appiarius recommended that Bennett undergo Ketamine treatment, but Bennett "prefer[red] holding up." Tr. 1657. The provider commented that Bennett's sleep disorder should be investigated since "sleep deprivation can worsen[] headaches." Tr. 1659. She continued Bennett's medication, asked

4

Bennett to attempt to obtain her 2021 sleep study records, and ordered a "video 24 hour EEG." Tr. 1659. Appiarius recommended that Bennett keep a headache diary "for [a] more accurate response to treatment." Tr. 1659.

In March 2024, Bennett had a follow-up visit for right shoulder pain. Tr. 1625. An MRI showed "[t]endinosis and partial intrasubstance tear of the supraspinatus tendon." Tr. 1625.

In April 2024, Bennett saw her primary care doctor for a medication recheck for her attention deficit hyperactivity disorder (ADHD). Tr. 1594, 1599. She had no concerns with her ADHD medication. Tr. 1599. The doctor diagnosed ADHD, post-traumatic stress disorder (PTSD), muscle pain, migraines, tension-type headaches, and "[o]ther fatigue." Tr. 1594.

In May 2024, Bennett underwent a 24-hour EEG to monitor possible seizures during sleep. Tr. 1469. "[N]o seizures or push events occurred," Tr. 1484, but she "did not get good sleep," Tr. 1478.

In June 2024, Bennett saw a nurse practitioner at her primary care office to ask if she could go back on Adderall for her ADHD. Tr. 1389. Bennett explained that she had taken Adderall in the past with good results, but her insurance stopped covering it. Tr. 1389. Bennett obtained new insurance and wanted to see if it would cover Adderall. Tr. 1389. The nurse switched Bennett's ADHD medication to Adderall. Tr. 1389. The nurse noted that Bennett's neurologist wanted her to wean off Metoprolol, and the nurse began to titrate that medication down. Tr. 1389. That day, Bennett denied weakness

5

and headaches. Tr. 1390. In Bennett's after-visit summary, the nurse included a printout called "Migraine Headache: Care Instructions." Tr. 1401–02.

In October 2024, Bennett saw Clinical Neuropsychologist Mellisa A. Boyle, PhD, for a neuropsychological evaluation on a referral from Nurse Appiarius. Tr. 3352–57. Bennett reported having cognitive issues since sustaining a concussion from a car accident in April 2023. Tr. 3352–53. She reported short- and long-term memory problems, worsening anxiety and nightmares, and problems with concentration and focus. Tr. 3352. She saw a counselor weekly for PTSD. Tr. 3352. On exam, Dr. Boyle found that Bennett had a normal range of affect, an anxious mood, and unremarkable other findings. Tr. 3354. She wrote that Bennett's "overall approach to testing was marked by reduced effort," that "free-standing tasks of test engagement were well below expectations, … so results of the current evaluation are interpreted as a potential underestimate of … Bennett's current cognitive functioning." Tr. 3354. Nevertheless, Dr. Boyle assessed Bennett's results as "average" in the following areas: intellectual functioning, visual perception, speech and language, and portions of attention and higher cognitive functioning. Tr. 3355. Other aspects of her attention and higher cognitive functioning were "at least partially intact." Bennett's memory could not be fully evaluated but she "demonstrated some healthy neurocognitive functions." Tr. 3355. Dr. Boyle wrote that Bennett's affective functioning results "are interpreted with caution" because there was "significant psychometric evidence of attempts to

6

portray herself in distorted light (independent of actual psychopathology)." Tr. 3355. Dr. Boyle's impression was that despite her finding that Bennett's evaluation "appear[ed] to be a potential underestimate of" Bennett's cognitive functioning, "there are indications of intact functioning in all cognitive domains despite variability." Tr. 3356. She wrote that "[t]he overall profile of strengths and weaknesses demonstrated in … Bennett's test performance is not typical of what is seen after a concussion, mild brain injury, or even a moderate brain injury." Tr. 3356. Dr. Boyle recommended that Bennett's treatment team balance her need for pain and headache medication with cognitive side effects, and that Bennett pursue Cognitive Processing Therapy for PTSD. Tr. 3357.

*State agency opinions*[4]

In September 2023, Rohini Mendonca, MD, reviewed Bennett's record. Tr. 110, 114. Regarding Bennett's residual functional capacity (RFC),[5] Dr.

---

[4]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Mendonca found that Bennett could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. 114. Bennett had postural and environmental limitations. Tr. 114–15. In June 2024, Debra Cody-Aron, MD, reviewed Bennett's updated medical records, Tr. 132–33, and affirmed Dr. Mendonca's findings. Tr. 136–37.

In February 2024, Susan Daugherty, PhD, reviewed Bennett's record, and concluded that Bennett had no severe mental medically determinable impairments. Tr. 110–12. In June 2024, Kevin Lauer, PhD, reviewed Bennett's updated record. Tr. 139. Regarding Bennett's mental RFC, Dr. Lauer found that Bennett could understand and remember simple and multi-step tasks in a routine work setting, but not at a production pace, such as assembly line work. Tr. 137–38. She could occasionally interact with supervisors, coworkers, and the general public. Tr. 138.

*Hearing testimony*

Bennett, who was represented by counsel, testified at the telephonic administrative hearing held in November 2024. At this hearing:

> [Bennett] testified that she has 4 to 5 migraine headaches a month that require her to lay down and sometimes she has to take a muscle relaxer and take break[-]through medication, which makes her very tired. She has had this level of migraine since her car accident in April 2023….She has difficulty sleeping at night, and takes one and ½ to 2 ½ hour naps during the day. She has breakthrough anxiety

> 4 to 5 nights a week. She will wake up screaming from nightmares and generally only gets four hours of sleep…. She takes ADHD medicine, and sometimes that helps. She tried to paint her laundry room, but only got halfway through because she got distracted.

Tr. 27.

The ALJ discussed with the vocational expert Bennett's past work as a general laborer, and a composite job of traffic management apprentice and material handler. Tr. 67. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Bennett could perform Bennett's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 67–69. The vocational expert answered that such an individual could not perform Bennett's past work, but could perform the following, additional jobs—garment folder, merchandise marker, and router clerk. Tr. 68–69.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.
>
> 2. The claimant has engaged in substantial gainful activity since April 10, 2022, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The claimant has the following severe impairments: post-traumatic stress disorder (PTSD); generalized anxiety disorder/social anxiety

9

disorder/panic disorder; depression/bipolar disorder; chronic fatigue syndrome; and schizoaffective disorder, bipolar type. (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except postural limitations of occasional climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Environmental limitations to avoid more than occasional, concentrated exposure to moving mechanical parts and high exposed places. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgement to make simple work-related decisions, with occasional changes in a routine work setting. Occasional interaction with the general public, coworkers, and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was … 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled,"

whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 10, 2022, through the date of this decision (20 CFR 404.1520(g)).

Tr. 20–32.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

11

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

12

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Bennett presents one assignment of error: that the ALJ "fail[ed] to consider and take into account the medical evidence that came into the record after the agency opinions," which amount to records dated after January 2024. Doc. 10, at 4. Her argument extends to different aspects of the ALJ's decision. I discuss each of them in turn.

As an initial matter, "there is always some time lapse between the consultant's report and the ALJ hearing and decision," *Jones v. Colvin*, No. 5:13-cv-1781, 2014 WL 4594812, at *3 (N.D. Ohio Sept. 12, 2014), and so long as the ALJ considered the subsequent evidence and "took into account any relevant changes in [the claimant's] condition," there is no error in the ALJ's reliance on the state agency reviewers' opinions, *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009). Here, the ALJ discussed evidence dated after January 2024. Tr. 28–29, 31. So there was no per se insufficient opinion evidence and no error. *See McGrew*, 343 F. App'x at 32. And the ALJ is not required to discuss every piece of evidence, *see Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004), so the ALJ's failure to cite every treatment note that Bennett discusses is not error. Furthermore, because the ALJ included in the RFC assessment more physical and mental limitations than the state agency reviewers had assessed, any purported error that Bennett claims that ALJ made when relying on these opinions, *see* Doc. 12, at 1, would fail. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL

14

2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the state agency reviewers' opinions) (citations omitted); *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

Finally, Bennett's argument in her reply brief that the ALJ erred because there wasn't an opinion that post-dated the state agency reviewers' opinions, Doc. 12, at 2, fails for two reasons. First, Bennett raised this argument for the first time in her reply brief, which is an improper way to raise an argument. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018). Second, "[n]o bright-line rule exists in [the Sixth] [C]ircuit directing that medical opinions must be the building blocks of the residual functional capacity finding." *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019). The ALJ wasn't required to obtain an updated opinion.

Having dispatched Bennett's procedural arguments related to evidence received in the record after the state agency reviewers rendered their opinions, I turn to Bennett's substantive arguments.

Bennett argues that the ALJ erred at step three when she evaluated Bennett's migraines under Listing 11.02.[6] Doc. 10, at 14. But at the hearing,

---

[6] The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

after Bennett's attorney identified what he believed were Bennett's severe impairments, the ALJ asked him whether "any of these impairments meet or equal the listings or is this a step 5?"[7] Tr. 46. Bennett's attorney answered, "I think it's step 5, Your Honor." Tr. 46.

"The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991). This doctrine "is a branch of waiver by which the courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Id.* at 61. The *invited error* doctrine has been applied to administrative proceedings, *see E.L. ex rel. Lorsson v. Chapel Hill–Carrboro Bd. of Educ.*, 773 F.3d 509, 516 (4th Cir. 2014), *St. Anthony Hosp. v. Dept. of H.H.S*, 309 F.3d 680, 696 (10th Cir. 2002), *Johnson v. I.N.S.*, 971 F.2d 340, 343–44 (9th Cir. 1992), including social security disability appeals, *see Dowling v. Comm'r of Soc.* Sec., No. 1:16-cv-2180, 2017 WL 2417077, at *9 (N.D. Ohio May 18, 2017) (applying the *invited error* doctrine when an attorney told the ALJ at the hearing that the evidence didn't support a finding that the claimant satisfied Listing 12.05 but argued

---

[7]     "[A]t step five, the ALJ considers the claimant's RFC in combination with other factors and asks whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v), (g)(1). If the ALJ determines that the claimant "can make an adjustment to other work," the ALJ "will find that [the claimant is] not disabled." 20 C.F.R. § 416.920(a)(4)(v); *see id*. at 416.920(g)(1).

on appeal that the ALJ erred by not considering Listing 12.05), *report and recommendation adopted*, 2017 WL 2416992 (N.D. Ohio June 3, 2017).

Here, when the ALJ asked Bennett's attorney whether Bennett's impairments satisfied a listing at step three, the attorney answered that Bennett's case was a "step 5" case. Tr. 46. Bennett cannot now complain that the ALJ erred at step three when she found that Bennett didn't satisfy Listing 11.02, since her attorney expressly told the ALJ that he was not alleging that Bennett's impairments satisfied this or any other listing.

Even if the Court were to consider Bennett's step three argument, it would fail. The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet'" or equal "the listing." There is no heightened articulation standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, as the ALJ noted, "Primary headache disorder or migraines is not a listed impairment," but *a primary headache disorder*, "alone or in combination with other impairment(s), [may] medically equal[] a listing." Tr. 24; Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019). Listing 11.02, epilepsy, is the "most closely analogous listed impairment" for a *primary headache disorder*, and such a disorder may medically equal Listing 11.01B or 11.02D. *Id.*

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
>
> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning.

18

Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7. The ALJ found that Bennett's migraines did not equal paragraph B or D of Listing 11.02. Tr. 24.

Bennett references five pages of medical records that she summarizes, including some that aren't about her migraines, Doc. 10, at 9–14, and concludes, "this … evidence documents ongoing headaches putting [Bennett] out of commission, at minimum (when heavily medicated after many medications adjustments) 3 to 4 days per month," *id.*, at 14. But she has to show that she experiences headaches "at least once a week *for at least 3 consecutive months*." Soc. Sec. Ruling 19-4p, 2019 WL 4169635, at *7 (emphasis added); *see Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) ("'For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'") (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Bennett has not even alleged that she satisfies this criteria, let alone shown so by pointing to specific evidence in the record. Bennett has therefore not shown that the ALJ erred. *See Thacker*, 93 F. App'x at 728 (stating that a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency").

Nevertheless, the Commissioner has provided a timeline that shows that the evidence Bennett summarizes doesn't indicate that Bennett had

headaches at least once a week for at least three consecutive months. Doc. 11, at 7. The Commissioner states:

> Plaintiff notes that she reported headaches on February 15, 2024, April 19, 2024, May 9 and 10, 2024, and June 24 and 25, 2024. Pl. Br. at 6. The only records that could satisfy the "three month consecutive" requirement are the April 2024, May 2024 and June 2024 treatment notes. However, the treatment records do not satisfy the requirements of the listing because in April 2024 there is no information about the frequency of the headaches (Tr. 1599) and in May 2024, the EEG was normal with no seizure or push button events reported. Tr. 1478, 1484, 1487. Plaintiff reported weekly headaches in June 2024 but a single month of continuous headaches does not satisfy the standard set forth in the listing. Thus, even if the ALJ had found Plaintiff's statements consistent with the evidence, which she did not, Plaintiff would not have met her burden to show that her headaches were medically equivalent to listing 11.[0]2(B).

*Id*. at 7–8 (footnote omitted).[8] In response, Bennett complains that the Commissioner "fails to address days where headaches incapacitate" her. Doc. 12, at 2. She submits that "[a] migraine that disables a claimant three to four days per month is functionally equivalent to seizure days." *Id*. at 3. But Bennett's assertions don't address the *consecutive-three-month* requirement in Listing 11.02.[9] Nowhere has Bennett stated that she meets the consecutive-

---

[8]    Because the ALJ found that Bennett didn't have any marked limitations in mental functioning, Tr. 25, a finding that Bennett doesn't challenge, Bennett hasn't shown that she can satisfy Listing 11.02D.

[9]    Bennett seems to believe that the ALJ (and the Commissioner, in his brief) didn't consider headaches to be seizures when discussing Listing 11.02. Doc. 12, at 3. Bennett's supposition is belied by the record, which shows that

20

three-month requirement. The ALJ found that she did not, and Bennett hasn't shown that the ALJ's finding was unsupported by the evidence.

Next, Bennett challenges the ALJ's statement, later in the decision, about Bennett's migraine frequency and treatment. Doc. 10, at 15 (citing Tr. 28). The ALJ wrote:

> Regarding the claimant's Hashimoto's disease, chronic pain disorder, chronic pain syndrome and fibromyalgia, and migraines, not intractable, the undersigned finds insufficient treatment history, objective medical evidence, and clinical findings to support limitations beyond those outlined in the residual functional capacity….[Bennett] has had improvement with her migraines with Ajovy and is down to only three to four headaches a month (C14F/4; 4F/108; 8F/36).

Tr. 28. Bennett argues that her migraines were not "casual headaches that [she] can work through," and insinuates that her migraines can last a whole day. Doc. 10, at 15–16. In support, Bennett cites a Migraine Headache Care Instruction printout that was included in a June 2024 primary-care, after-visit summary. *Id.* at 16 (citing Tr. 1401). These instructions advise a patient to "[r]est in a quiet room until your headache is gone." *Id.* at 16 (citing Tr. 1401). This is not evidence that Bennett's headaches last a whole day. She claims that

---

the ALJ expressly stated that she considered whether Bennett's "primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures)." Tr. 24. There was also evidence in the record that Bennett may have had seizures, and she had an EEG to evaluate this possibility. Tr. 1469. So the ALJ (and the Commissioner) properly discussed whether any of Bennett's possible seizure activity satisfied Listing 11.02, *Epilepsy*. Tr. 24.

"the record does not refer to these headaches as just lasting short periods, and instead calls them 'headache days,' not consistent with them being days that are about much more than the migraine." *Id*. Bennett doesn't provide a citation to support this statement, and nowhere else in her brief has she cited a page from the record referencing a "headache day."

Bennett says that her "worst pain is occurring at 8 to 9 out of 10 and … still occurs with medications, at minimum, three to four days per month." *Id*. (citing Tr. 1656, 3354). But the treatment notes she cites don't say all of these things. The portion of the February 2024 treatment note that Bennett cites recounts her "Migraine history," including that her migraines started when she was 18; at worst her pain level was "8–9/10," and that they occurred "15-20 days per month." Tr. 1656. This history doesn't indicate that at the time of her visit Bennett reported experiencing severe migraine pain 15 to 20 times a month. Tr. 1656. In fact, the same *Migraine history* was recited at Bennett's other neurology visits when Bennett denied severe migraines. *See, e.g.* Tr. 1135 (a November 2023 neurology note reciting the same *Migraine history*; at that visit, Bennett said that her medication was effective and that "she is satisfied since [her headaches] ha[ve] improved in severity and duration."). So the *Migraine history* portion of the treatment note doesn't show that Bennett was at all relevant times experiencing migraines rated an eight to ten in severity for 15 to 20 times a month. Nor does this history specify that Bennett's severe pain persists when she uses her medications. Tr. 1656.

22

Next, Bennett objects to the ALJ's statement that she "has a very limited treatment history for her allegedly disabling mental impairments, consisting of medicinal management through h[er] primary care source, and counseling every other week." Doc. 10, at 16 (citing Tr. 29). In support of her argument, Bennett cites *Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 363 (4th Cir. 2023). *Id.* In *Shelly*, the court observed that the claimant's chronic depression waxed and waned and was "treatment resistant." 61 F.4th at 363. The court referenced the claimant's "atypical antidepressants, serotonin-norepinephrine reuptake inhibitors, benzodiazepines, and atypical antipsychotics," and wrote that "[a] growing number of district courts have held that in cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'" *Id.* The court also noted that the claimant's doctor recommended that she undergo Transcranial Magnetic Stimulation or Electro Convulsive Therapy, which, the court observed, are "forms of treatment … only offered and administered to those with the most severe cases of depression." *Id.* at 363–64.

Here, in contrast to the treatment-resistant claimant in *Shelley*, the ALJ found that Bennett "herself describes that her mental health medications are 'somewhat helpful' or that she is 'doing better' on medication and that she does not need help with her activities of daily living." Tr. 30. The ALJ commented

that Bennett's "objective clinical presentation is consistently quite mild." Tr. 30. And the ALJ observed that:

> [Bennett's] stress and fatigue increased after losing a family member (8F/142). However, her symptoms improved, and she was working on even coming off of some of her medications such as Cymbalta and gabapentin (8F/142). She had normal mood and behavior and normal thought content and judgment (10F/93). She had some instances of distractibility and inattentiveness that were self-reported, but she had normal attention and concentration with intact memory and cognition during most of her mental status examinations (6F/7; 4F/11-18, 24-26, 48, 52, 70). She had a stable and calm mood (5F/6). She was cooperative (4F/11, 18; 14F). She had a normal mental status neurological exam in August 2023 with a calm mood and normal comprehension and appropriate knowledge for age (C9F/1042).

Tr. 30. The ALJ also evaluated the opinion evidence, including that:

> [i]n February 2024, [Bennett] had a consultative psychiatric evaluation and M. Bassiouni, PA-C, opined that the claimant could follow simple and complex instructions in relation to understanding, carrying out, remembering instructions; that she should be able to sustain attention in a competitive work environment in regards to sustaining attention and persisting and pace; that she got along well with supervisors, coworkers, and the general public; and that she could tolerate stress associated with work activity as she takes medication for her anxiety (7F/5). This is persuasive. This is supported by the notation that the claimant was cooperative during the examination and had correct immediate recall of correct remote memory and was able to spell the word world backwards (7F). This is consistent with the reports that she had normal attention and concentration with intact memory and cognition during most of her mental status examinations and

24

she was cooperative (6F/7; 4F/11-18, 24-26, 48, 52, 70; 14F).

Tr. 31.

Bennett has not shown that the ALJ failed to properly evaluate evidence in the record, or that the ALJ erred at step three or at any other step in the decision.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 19, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).